# DECLARATION OF ALAN WEIS

I, Alan Weis, being of lawful age and duly sworn upon oath, submit this Declaration in accordance with 28 U.S.C. 1746. I have personal knowledge of the facts herein. In my capacity as Legislative Chief Information Technology Officer I also have access to LAS business records which consist of records made at or near the time by or from information transmitted by a person with knowledge, such records being kept in the course of the regularly conducted activity of LAS and the making of such records being a regular practice of LAS' activity on behalf of the Kansas Legislature. Where pertinent, copies of LAS business records are attached as Exhibits hereto.

1. I am employed as the Legislative Chief Information Technology Officer Branch as per K.S.A. 75-7207. I have been so employed at all times relevant to this Declaration.

2. I have been involved in the Kansas Virtual Statehouse Project ("KS VSP"). That involvement includes assisting Tom Day in presentations regarding the KS VSP to the Joint Legislative Budget Committee and to the LCC, including all the necessary preparation and research, assisting in the preparation of the RFP for the KS VSP, reviewing vendor submissions and assisting in vendor selection, and now assisting in the installation of the KS VSP, which began on November 19, 2020.

3. As the Chief Information Technology Officer for the Legislative Branch, I am responsible for reviewing technology projects of the Legislative Branch and ensuring that they comply with guidelines for state information technology projects as per K.S.A. 75-7208(a). I reviewed the KS VSP for compliance with state information technology policies, including but not limited to ITEC Policy 12.0. As state technology project, the KS VSP was filed with the Kansas Information Technology Office as per the attached letter dated September 23, 2020, and will be monitored quarterly by the KITO Office, the chief information technology officers for the three branches of Kansas government, and by the Joint Committee on Information Technology. All state technology projects follow policies adopted by the Information Technology Executive Council ("ITEC"), including ITEC Policy 1210 Revision 3, which includes the provision that: "6.1. All entity ICT shall be accessible to and usable by individuals with disabilities in accordance with federal and state law." A copy of the policy is available on the

Exhibit 2

Internet at https://ebit.ks.gov/itec/resources/policies/policy-1210, and for the Court's convenience, a copy is also attached hereto.

4. The KS VSP project has been undertaken in an unusually expedited manner due to the continued need for remote work and virtual meetings to reduce the health risk of the Covid-19 pandemic. A project of this size and complexity normally taking nine months to install systems in thirteen committee rooms was completed in six weeks. Hundreds of pieces of equipment were ordered, shipped and installed in all thirteen separate committee rooms and the two legislative chambers. The installation work in ten conference and training rooms and two rooms in the visitor center is continuing at this time and will be completed by the contract end date. This project also required updating all network data switches throughout the Statehouse to allow higher networking speeds; this work was completed by the Office of Information Technology Services (OITS) in the Executive Branch. The project also required all existing committee room audio systems to be upgraded with new equipment. This work is ongoing and is being done by Mission Electronics, Inc. under a service agreement with the Kansas Legislature. A successful captioning project requires that the hardware be sufficient for ensuring adequate audio and visual streaming; updating the rooms involved was the essential first step in the KS VSP. It was not an easy project due to the many systems and components that needed to be updated for the project.

5. The primary contractor on the KS VSP is World Wide Technology. WWT has a number of subcontractors, including Cisco and Coltrane. The Project involves approximately 100 employees. Information Technology Services (OITS) and Facilities and Property Management were also involved. The system went up on January 6, 2021. The system was tested on an expedited basis on January 7 and 8, 2021. Testing was limited due to the short timeframe to implement the systems. A normal testing period for a project of this magnitude should be 4 to 6 weeks. During the first two weeks of the legislative session, the testing process was delayed when the vendor had to quarantine two employees due to COVID on the first week; three days were lost the second week because of the Martin Luther King Holiday and two days upon which the Statehouse was closed due to a security concern related to the Inauguration.

6. A goal of the KS VSP will be real-time closed captioning on all audio and visual streamed legislative content. WWT and Cisco will be primarily responsible for the captioning piece of the KS VSP. The captioning is provided by the Webex system, which will be streamed into the existing software platform of Sliq Media Technologies where the audio, video and text will be made available to the public. The public viewing will eventually be switched from YouTube to the Sliq system. The goal will be the highest degree of accuracy for the captioning, at least 95% accuracy. The contract calls for the project to be complete on or before February 28, 2021.

Exhibit 2

7. In the past, neither Tom Day nor LAS controlled the captioning of legislative proceedings posted on the Legislature's YouTube channel. Absent any technical issues, video and audio from legislative proceedings are streamed to YouTube in near real time and given auto-generated captions quickly, generally within 24-hours of posting. In terms of the YouTube postings the week of January 11 to January 15, 2021, it appears that technical issues may have interfered with some items being carried over to YouTube from the Legislative Website. I did have occasion to look at the YouTube captioning that was provided and it appeared to me to be surprisingly accurate considering the uncommon and unusual terms that are used in discussing legislation and policies.

8. When the Kansas Virtual Statehouse Project is complete, there will no longer be audio-only streams of legislative proceedings. The audio and visual streams with the real-time closed captioning will be made available to the public through the Legislature's Website. The captioning will no longer be provided by YouTube and it is anticipated that the Kansas Legislature's proceedings will not be provided via the YouTube channel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 2, 2021.

    /s Alan Weis
    Alan Weis
    Legislative Chief Information Technology Officer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CHRIS HAULMARK,                            )<br>                                                              )<br>             Plaintiff,                              )<br>                                                              )<br>v.                                                         )   Case. No. 20-cv-4084-EFM-TJJ<br>                                                              )<br>                                                              )<br>STATE OF KANSAS, et al.,              )<br>                                                              )<br>             Defendants.                         )<br>                                                              ) | |

# Weis Exhibit A

Sept. 23, 2020 Letter to Terri Clark, Director of Technical Services

# STATE OF KANSAS

## Kansas Legislative Office of Information Services

300 SW 10th Avenue
Suite 63-W
Topeka, Kansas 66612
Phone: (785) 296-7666



**Alan Weis**
Chief Information Technology Officer

September 23, 2020

Terri Clark
Director of Technical Services
Kansas Legislative Office of Information Services
300 SW 10th Ave, Room 063-W
Topeka, KS 66612

Dear Terri,

On September 16th, 2020, the Legislative Coordinating Council approved the project for vendor review and systems analysis by Request For Proposal (RFP). Thank you for submitting the high-level project plan for the Kansas Virtual Statehouse. I have reviewed the project plan and find it to be in order. This letter formally approves the project for RFP release and response review. In accordance with K.S.A. 75-7201 et seq, please forward a copy of this letter with the Kansas Virtual Statehouse project plan to the KITO office. We are very grateful to you and your team for the excellent work in preparing the project documents.

Sincerely,

Thomas Day
Director of Legislative Services

Alan Weis
Chief Information Technology Officer

Cc:   Rep. Ron Ryckman, Speaker of the Kansas House of Representatives and Chair of the LCC
      Gordon Self, Revisor of Statutes
      J.G. Scott, Director of the Kansas Legislative Research Department
      Susan Kannarr, Chief Clerk of the House
      Corey Carnahan, Secretary of the Senate
      Eric Theel, Director of Application Services, KLOIS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CHRIS HAULMARK, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case. No. 20-cv-4084-EFM-TJJ |
| STATE OF KANSAS, et al., | ) ) ) ) |
| Defendants. | ) ) |

**Weis Exhibit B**

ITEC Policy 12.0.

Search

# ITEC Policy 1210 Revision 3 – Information and Communication Technology Accessibility Standards

1.0 TITLE: Information and Communication Technology Accessibility Standards

    1.1 EFFECTIVE DATE: October 26, 2000

        1.1.1 REVISED: October 26, 2006

        1.1.2 REVISED: April 23, 2009

        1.1.3 REVISED: December 11, 2018

    1.2 TYPE OF ACTION: New Policy

2.0 PURPOSE: This policy contains scoping and technical requirements for information and communication technology (ICT) to ensure accessibility and usability by individuals with disabilities. Compliance with these standards is mandatory for organizations specified in section 3.0.

3.0 ORGANIZATIONS AFFECTED: All branches, boards, commissions, departments, divisions, and agencies of state government, hereafter referred to as "entities."

4.0 REFERENCES:

    4.1 K.S.A. 44-1001, et seq. Kansas Acts Against Discrimination.

    4.2 42 U.S.C. 12101, et seq. Americans with Disabilities Act (ADA). See also 28 C.F.R. Part 35.130, et seq., 28 C.F.R. Part 35.160, et seq., and K.S.A. 58-1301 et seq.

    4.3 29 U.S.C. 794d. Section 508 of the Rehabilitation Act of 1973, as amended.

    4.4 36 C.F.R. Part 1194, Appendices A and C. Revised Section 508 Standards.

    4.5 The specific editions of the standards and guidelines listed in Chapter 7 of the Section 508 Standards, especially ISO/IEC 40500:2012, the World Wide Web Consortium (W3C) Web Content Accessibility Guidelines (WCAG) 2.0 (https://www.w3.org/TR/WCAG20/).

    4.6 K.S.A. 75-7203, which authorizes the Information Technology Executive Council (ITEC) to: Adopt information resource policies and procedures and provide direction and coordination for the application of the state's information technology resources for all state entities.

    4.7 Kansas Governor's Executive Order 08-12, which directs the Kansas Partnership for Accessible Technology (KPAT) to: address web and information technology accessibility issues and provide policy, standards, guidelines, or procedural recommendations to the Information Technology Executive Council.

5.0 DEFINITIONS/BACKGROUND:

    5.1 DEFINITIONS

        5.1.1 Terms Defined in Referenced Standards: Terms defined in referenced standards and not defined in this policy shall have the meaning as defined in the referenced standards.

        5.1.2 Undefined Terms: Any term not defined in this policy or in referenced standards shall be given its ordinarily accepted meaning in the sense that the context implies.

        5.1.3 Interchangeability: Words, terms, and phrases used in the singular include the plural and those used in the plural include the singular.

        5.1.4 Defined Terms: For the purpose of this policy, the terms defined herein have the indicated meaning.

            5.1.4.1 Agency. Any entity as specified in section 3.0.

5.1.4.2 Alteration. A change to existing ICT that affects interoperability, the user interface, or access to information or data.

5.1.4.3 Application. Software designed to perform, or to help the user to perform, a specific task or tasks.

5.1.4.4 Assistive technology (AT). "Assistive technology" shall have the meaning ascribed to such term in K.S.A. 65-7102, and amendments thereto.

5.1.4.5 Audio description. Narration added to the soundtrack to describe important visual details that cannot be understood from the main soundtrack alone. Audio description is a means to inform individuals who are blind or who have low vision about visual content essential for comprehension. Audio description of video provides information about actions, characters, scene changes, on-screen text, and other visual content. Audio description supplements the regular audio track of a program. Audio description is usually added during existing pauses in dialogue. Audio description is also called "video description" and "descriptive narration".

5.1.4.6 Authoring tool. Any software, or collection of software components, that can be used by authors, alone or collaboratively, to create or modify content for use by others, including other authors.

5.1.4.7 Closed functionality. Characteristics that limit functionality or prevent a user from attaching or installing assistive technology. Examples of ICT with closed functionality are self-service machines, information kiosks, set-top boxes, fax machines, calculators, and computers that are locked down so that users may not adjust settings due to a policy such as Desktop Core Configuration.

5.1.4.8 Content. Electronic information and data, as well as the encoding that defines its structure, presentation, and interactions.

5.1.4.9 Document. Logically distinct assembly of content (such as a file, set of files, or streamed media) that: functions as a single entity rather than a collection; is not part of software; and does not include its own software to retrieve and present content for users. Examples of documents include, but are not limited to, letters, email messages, spreadsheets, presentations, podcasts, images, and movies.

5.1.4.10 Existing ICT. ICT that has been procured, maintained or used on or before the compliance deadline specified in section 7.2.

5.1.4.11 Hardware. A tangible device, equipment, or physical component of ICT, such as telephones, computers, multifunction copy machines, and keyboards.

5.1.4.12 Information technology (IT). An inclusive term to address the services and functions commonly associated with information systems and telecommunications.

5.1.4.13 Information and communication technology (ICT). Information technology and other equipment, systems, technologies, or processes, for which the principal function is the creation, manipulation, storage, display, receipt, or transmission of electronic data and information, as well as any associated content. Examples of ICT include, but are not limited to: computers and peripheral equipment; information kiosks and transaction machines; telecommunications equipment; customer premises equipment; multifunction office machines; software; applications; web sites; videos; and, electronic documents.

5.1.4.14 Keyboard. A set of systematically arranged alphanumeric keys or a control that generates alphanumeric input by which a machine or device is operated. A keyboard includes tactilely discernible keys used in conjunction with the alphanumeric keys if their function maps to keys on the keyboard interfaces.

5.1.4.15 Label. Text, or a component with a text alternative, that is presented to a user to identify content. A label is presented to all users, whereas a name may be hidden and only exposed by assistive technology. In many cases, the name and the label are the same.

5.1.4.16 Menu. A set of selectable options.

5.1.4.17 Name. Text by which software can identify a component to the user. A name may be hidden and only exposed by assistive technology, whereas a label is presented to all users. In many cases, the label and the name are the same. Name is unrelated to the name attribute in HTML.

5.1.4.18 Non-web document. A document that is not: a web page, embedded in a web page, or used in the rendering or functioning of web pages.

5.1.4.19 Non-web software. Software that is not: a web page, not embedded in a web page, and not used in the rendering or functioning of web pages.

5.1.4.20 Operable part. A component of ICT used to activate, deactivate, or adjust the ICT.

5.1.4.21 Platform accessibility services. Services provided by a platform enabling interoperability with assistive technology. Examples are Application Programming Interfaces (API) and the Document Object Model (DOM).

5.1.4.22 Platform Software. Software that interacts with hardware, or provides services for other software. Platform software may run or host other software, and may isolate them from underlying software or hardware layers. A single software component may have both platform and non-platform aspects. Examples of platforms are: desktop operating systems; embedded operating systems, including mobile systems; web browsers; plug-ins to web browsers that render a particular media or format; and sets of components that allow other applications to execute, such as applications which support macros or scripting.

5.1.4.23 Programmatically determinable. Ability to be determined by software from author-supplied data that is provided in a way that different user agents, including assistive technologies, can extract and present the information to users in different modalities.

5.1.4.24 Public facing. Content made available by an entity to members of the general public. Examples include, but are not limited to, an entity website, blog post, or social media pages.

5.1.4.25 Real-time text (RTT). Communications using the transmission of text by which characters are transmitted by a terminal as they are typed. Real-time text is used for conversational purposes. Real-time text also may be used in voicemail, interactive voice response systems, and other similar application.

5.1.4.26 Revised 508 Standards. The standards for ICT developed, procured, maintained, or used by agencies subject to Section 508 of the Rehabilitation Act as set forth in 508 Chapters 1 and 2 (36 C.F.R. Part 1194, Appendix A), and Chapters 3 through 7 (36 C.F.R. Part 1194, Appendix C).

5.1.4.27 Software. Programs, procedures, rules, and related data and documentation that direct the use and operation of ICT and instruct it to perform a given task or function. Software includes, but is not limited to, applications, non-web software, and platform software.

5.1.4.28 Software tools. Software for which the primary function is the development of other software. Software tools usually come in the form of an Integrated Development Environment (IDE) and are a suite of related products and utilities. Examples of IDEs include Microsoft® Visual Studio®, Apple® Xcode®, and Eclipse Foundation Eclipse®.

5.1.4.29 Telecommunications. The signal transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

5.1.4.30 Terminal. Device or software with which the end user directly interacts and that provides the user interface. For some systems, the software that provides the user interface may reside on more than one device such as a telephone and a server.

5.1.4.31 Text. A sequence of characters that can be programmatically determined and that expresses something in human language.

5.1.4.32 TTY. Equipment that enables interactive text based communications through the transmission of frequency-shift-keying audio tones across the public switched telephone network. TTYs include devices for real-time text communications and voice and text intermixed communications. Examples of intermixed communications are voice carry over and hearing carry over. One example of a TTY is a computer with TTY emulating software and modem.

5.1.4.33 Variable Message Signs (VMS). Non-interactive electronic signs with scrolling, streaming, or paging-down capability. An example of a VMS is an electronic message board at a transit station that displays the gate and time information associated with the next train arrival.

5.1.4.34 Voice over Internet Protocol (VoIP). "Voice over Internet Protocol" shall have the meaning ascribed to such term in K.S.A. 66-2017, and amendments thereto.

5.2 BACKGROUND

5.2.1 The State of Kansas ICT Accessibility Standards are based on the revised standards developed to implement Section 508 of the Rehabilitation Act of 1973, as amended. For further information on Section 508 Standards, go to https://section508.gov/content/learn/laws-and-policies.

Portions of the text of this policy have been extracted in whole or in part from the Section 508 standards 36 C.F.R. Part 1194. Exact Section 508 terminology is frequently used to minimize potential confusion resulting from different wording between these standards and Section 508. However, the wording and content of Section 508 have not been adopted in all situations. Modifications to Section 508 wording have been made to clarify or adapt the standards consistent with Kansas resources and needs. State entities should use these state standards to comply with Kansas law requiring ICT accessibility.

6.0 POLICY:

6.1 All entity ICT shall be accessible to and usable by individuals with disabilities in accordance with federal and state law.

7.0 PROCEDURES:

7.1 ICT that is procured, developed, maintained, or used by entities—including that produced internally; developed or provided through contractual, licensing, or other arrangements; provided by third parties on behalf of state entities; or purchased—shall conform to the Functional Performance Criteria and Technical Requirements of the Revised 508 Standards: 508 Chapters 3 through 7 (36 C.F.R. Part 1194, Appendix C).

7.2 All entity ICT must meet the requirements set forth in section 7.1 within 18 months of the publication date of this policy.

7.3 GENERAL EXCEPTIONS

    7.3.1 Legacy ICT. Any component or portion of existing ICT that complies with Information Technology Policy 1210 Revision 2, and that has not been altered on or after the compliance deadline specified in section 7.2, shall not be required to be modified to conform to these standards.

    7.3.2 Public Safety Systems: These standards do not apply to any ICT operated by entities as part of a public safety system.

    7.3.3 State Contracts: ICT acquired by a contractor incidental to a contract shall not be required to conform to these standards.

    7.3.4 ICT Functions Located in Maintenance or Monitoring Spaces: Where status indicators and operable parts for ICT functions are located in spaces that are frequented only by service personnel for maintenance, repair, or occasional monitoring of equipment, such status indicators and operable parts shall not be required to conform to these standards.

    7.3.5 Undue Burden or Fundamental Alteration: Where an entity determines in accordance with section 7.3.5 that conformance to requirements in these standards would impose an undue burden or would result in a fundamental alteration in the nature of the ICT, an exception may be requested, as detailed in section 7.3.5.2, for review by the State ADA Coordinator and the Director of IT Accessibility. If such an exception is granted, conformance shall be required only to the extent that it does not impose an undue burden, or result in a fundamental alteration in the nature of the ICT.

        7.3.5.1 Basis for a Determination of Undue Burden: In determining whether conformance to requirements in these standards would impose an undue burden on the entity, the entity shall consider the extent to which conformance would impose significant difficulty or expense considering the entity resources available to the program or component for which the ICT is to be procured, developed, maintained, or used.

        7.3.5.2 Required Documentation:

            7.3.5.2.1 The responsible entity official shall document in writing the basis for determining that conformance to requirements in these standards would constitute an undue burden on the entity, or would result in a fundamental alteration in the nature of the ICT.

            7.3.5.2.2 The documentation shall include an explanation, including an estimate of hard and soft costs that would be incurred, of why and to what extent compliance with applicable requirements would create an undue burden or result in a fundamental alteration in the nature of the ICT.

            7.3.5.2.3 The documentation shall describe the alternative means to be provided in accordance with section 7.3.5.3, as well as the short- and long-term plans, with a timeline, for making the ICT accessible. Progress updates shall be provided by the entity as requested by the State ADA Coordinator or the KPAT.

            7.3.5.2.4 The documentation shall be submitted to the State ADA Coordinator. Requests for exception must receive approval from the State ADA Coordinator prior to deployment of the ICT.

        7.3.5.3 Alternative Means: Where conformance to one or more requirements in these standards imposes an undue burden or a fundamental alteration in the nature of the ICT, the entity shall provide individuals with disabilities access to and use of information and data by an alternative means that meets identified needs.

    7.3.6 Best Meets: Where ICT conforming to one or more requirements in these standards is not commercially available, the entity shall procure the ICT that best meets these standards consistent with the entity's business needs.

        7.3.6.1 Required Documentation:

            7.3.6.1.1 The responsible entity official shall document in writing: (a) the non-availability of conforming ICT, including a description of market research performed and which provisions cannot be met, and (b) the basis for determining that the ICT to be procured best meets the requirements in these standards consistent with the entity's business needs.

            7.3.6.1.2 The documentation shall describe the alternative means to be provided in accordance with section 7.3.6.2.

7.3.6.1.3 The documentation shall be submitted to the State ADA Coordinator. Requests for exception must receive approval from the State ADA Coordinator prior to deployment of the ICT.

7.3.6.2 Alternative Means: Where ICT that fully conforms to these standards is not commercially available, the entity shall provide individuals with disabilities access to and use of information and data by an alternative means that meets identified needs.

7.4 ACCESS TO FUNCTIONALITY

7.4.1 Entities shall ensure that all functionality of ICT is accessible to and usable by individuals with disabilities, either directly or by supporting the use of assistive technology, and shall comply with section 7.4. In providing access to all functionality of ICT, entities shall ensure the following:

a. That state employees with disabilities have access to and use of information and data that is comparable to the access and use by state employees who are not individuals with disabilities; and

b. That members of the public with disabilities who are seeking information or data from a state entity have access to and use of information and data that is comparable to that provided to members of the public who are not individuals with disabilities.

7.4.2 User Needs: When entities procure, develop, maintain or use ICT they shall identify the needs of users with disabilities to determine:

a. How users with disabilities will perform the functions supported by the ICT; and

b. How the ICT will be developed, installed, configured, and maintained to support users with disabilities.

7.5 FUNCTIONAL PERFORMANCE CRITERIA: Where the requirements in 508 Chapters 4 and 5 do not address one or more functions of ICT, the functions not addressed shall conform to the Functional Performance Criteria specified in 508 Chapter 3.

7.6 ELECTRONIC CONTENT

7.6.1 Public Facing: Electronic content that is public facing shall conform to the accessibility requirements specified in section 7.6.3.

7.6.2 Entity Official Communication. Electronic content that is not public facing shall conform to the accessibility requirements specified in section 7.6.3 when such content constitutes official business and is communicated by an entity through one or more of the following:

a. An emergency notification;

b. An initial or final decision adjudicating an administrative claim or proceeding;

c. An internal or external program or policy announcement;

d. A notice of benefits, program eligibility, employment opportunity, or personnel action;

e. A formal acknowledgement of receipt;

f. A survey questionnaire;

g. A template or form;

h. Educational or training materials; or

i. Intranet content designed as a web page.

EXCEPTION: Records maintained by the State Records Board pursuant to state recordkeeping statutes shall not be required to conform to these standards unless public facing.

7.6.3 Accessibility Standard: Electronic content shall conform to Level A and Level AA Success Criteria and Conformance Requirements specified for web pages in WCAG 2.0 (incorporated by reference, see section 4.5).

EXCEPTION: Non-web documents shall not be required to conform to the following four WCAG 2.0 Success Criteria: 2.4.1 Bypass Blocks, 2.4.5 Multiple Ways, 3.2.3 Consistent Navigation, and 3.2.4 Consistent Identification.

7.6.3.1 Word Substitution when Applying WCAG to Non-Web Documents: For non-web documents, wherever the term "web page" or "page" appears in WCAG 2.0 Level A and AA Success Criteria and Conformance Requirements, the term "document" shall be substituted for the terms "web page" and "page". In addition, in Success Criterion in 1.4.2, the phrase "in a document" shall be substituted for the phrase "on a web page".

7.7 HARDWARE: Where components of ICT are hardware and transmit information or have a user interface, such components shall conform to the requirements in 508 Chapter 4.

7.8 SOFTWARE

7.8.1 Where components of ICT are software and transmit information or have a user interface, such components shall conform to section 7.8 and the requirements in 508 Chapter 5.

EXCEPTION: Software that is assistive technology and that supports the accessibility services of the platform shall not be required to conform to the requirements in 508 Chapter 5.

7.8.2 WCAG Conformance: User interface components, as well as the content of platforms and applications, shall conform to Level A and Level AA Success Criteria and Conformance Requirements specified for web pages in WCAG 2.0 (incorporated by reference, see section 4.5).

EXCEPTIONS:

1. Software that is assistive technology and that supports the accessibility services of the platform shall not be required to conform to section 7.8.2.

2. Non-web software shall not be required to conform to the following four Success Criteria in WCAG 2.0: 2.4.1 Bypass Blocks; 2.4.5 Multiple Ways; 3.2.3 Consistent Navigation; and 3.2.4 Consistent Identification.

3. Non-web software shall not be required to conform to Conformance Requirement 3 Complete Processes in WCAG 2.0.

7.8.2.1 Word Substitution when Applying WCAG to Non-Web Software: For non-web software, wherever the term "web page" or "page" appears in WCAG 2.0 Level A and AA Success Criteria and Conformance Requirements, the term "software" shall be substituted for the terms "web page" and "page". In addition, in Success Criterion in 1.4.2, the phrase "in software" shall be substituted for the phrase "on a web page."

7.8.3 Complete Processes for Non-Web Software: Where non-web software requires multiple steps to accomplish an activity, all software related to the activity to be accomplished shall conform to WCAG 2.0 as specified in section 7.8.2.

7.9 SUPPORT DOCUMENTATION AND SERVICES: Where an entity provides support documentation or services for ICT, such documentation and services shall conform to the requirements in 508 Chapter 6.

8.0 RESPONSIBILITIES:

8.1 Heads of entities are responsible to establish procedures for their organizations to comply with the requirements of this policy.

8.2 The KPAT will review this policy annually, to insure both its applicability and compliance with emerging regulations and standards.

9.0 CANCELLATION: Updates ITEC Policy #1210, Revision 2, titled "State of Kansas Web Accessibility Requirements".

**Accessibility Policy**
**Terms of Use**
**Sitemap**
**Contact Webmaster**
**Office of the Governor**
© Office of Information Technology Services

https://ebit.ks.gov/itec/resources/policies/policy-1210 6/6