# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **CHRIS HAULMARK**, | ) |
| Plaintiff, | ) |
| V. | ) |
| **STATE OF KANSAS**, | ) |
| **LEGISLATIVE ADMINISTRATIVE** | ) |
| **SERVICES**, | ) |
| and | ) Civil Action No. __5:20-cv-04084-EFM-TJJ__ |
| **TOM DAY**, in his official capacity as | ) |
| Director of Legislative Administrative | ) |
| Services, | ) |
| Defendants. | ) |
| _____ | ) |

### PLAINTIFF HAULMARK'S REPLY IN SUPPORT OF MOTION
### FOR TEMPORARY RESTRAINING ORDER
### AND PRELIMINARY INJUNCTION

COMES NOW Plaintiff Chris Haulmark, appearing *pro se*, hereby respectfully

requests the Court to reject Defendants' Opposition to Plaintiff's Motion for Temporary

Restraining Order and Preliminary Injunction (See Defendants' Response to Motion)

(Docket No. 14) (hereinafter "Defendants' Opposition") and grant the Motion for

Temporary Restraining Order and Preliminary Injunction. (See Plaintiff Haulmark's

Motion for Temporary Restraining Order) (Docket No. 5) (hereinafter "TRO") Plaintiff

Haulmark provides following statements and authorities:

# I. INTRODUCTION

1.      The Complaint in the above captioned matter was filed on December 16, 2020 to seek damages, including compensatory damages, equitable relief, including declaratory and injunctive relief, award of attorney fees if counsel is ever retained by Plaintiff Haulmark, and expenses of court against the named Defendants, alleging ongoing and repeating violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131-12134 *et seq.* (hereinafter "ADA") (See Complaint) (Docket No. 1)

2.      Plaintiff Haulmark, a qualified individual with a disability under Title II of the ADA, is experiencing continuing violations of the law. Plaintiff Haulmark has standing to pursue his claims, and his claims are not moot. The policy and purported changes proffered by Defendants do not meet the heavy burden required to demonstrate mootness. Moreover, while not required to defeat mootness, Plaintiff Haulmark continues to experience the denial of effective communication and equal participation in the services, programs, and activities offered by the Defendants.

3.      As one of the Defendants' services, programs and activities, the online broadcasting services have always had the capability to provide real-time captioning. In his TRO, Plaintiff Haulmark requests the court order the Defendants to enable the available real-time captioning so that Plaintiff Haulmark will be able to communicate effectively and participate equally in the current 2021 Legislative Session.

4.      While they fail to take affirmative actions to enable the available real-time captioning and produce the requested transcripts to eliminate discrimination against Plaintiff Haulmark pursuant to Title II of the ADA, they are holding back auxiliary aids

and services and demanding Plaintiff Haulmark to request for smaller specific ADA accommodations before they act. Because of these demands for smaller requests, they show that they have the ultimate authority to produce and furnish the requested accommodations. For two years, Plaintiff Haulmark has submitted multiple requests for real-time captioning and transcripts to gain effective communication access to their services, programs, and activities.

5.     In all of this time, Defendants have not acted on their promises and denied Plaintiff Haulmark equal access to all online broadcasting services, as well as all archived audio and video files, as services, programs, and activities. This has been a humiliating, dehumanizing, and unnecessary experience. Had the Defendants been readily accessible to provide Plaintiff Haulmark with the requested auxiliary aids and services, as legally required under Title II of the ADA, he would not have sustained the injuries and be forced to bring this matter to this Court.

## II. NATURE OF THE MATTER

6.     Plaintiff Haulmark filed Motion for TRO on January 21, 2021. (See Motion for TRO) (Docket No. 5)

7.     The Defendants filed a Response in Opposition to the TRO (hereinafter "Defendants' Response") on February 4, 2021. (See Response to Motion) (Docket No. 14)

8.     Plaintiff Haulmark filed for an extension of time to reply to this Defendants' Response, and was granted this extension without opposition. The deadline for this reply is 14 extra days to March 11, 2021. (See Motion for Extension of Time to File

Response/Reply) (Docket No. 16) (See Order on Motion for Extension of Time to File

Response/Reply) (Docket No. 17)

9.     The service of process upon Defendant Tom Day was challenged by a Motion

to Quash on January 25, 2021. (See Docket No. 8) (See Page 14, Last Paragraph in

Defendants' Opposition) ("To date, Day has not even been properly served.") Defendant

Tom Day filed a Motion to Dismiss on March 11, 2021 as an answer to Plaintiff

Haulmark's Complaint. (See Motion to Dismiss) (Docket No. 24) Because of this, the

matter of this service of process has been put to rest.

10.     Plaintiff Haulmark alleges being denied effective communication and equal

participation in the online broadcasting services and all of the archived video and audio

files because of his hearing disability. These online broadcasting services and archived

video and audio files as the services, programs, and activities are being controlled by the

Defendants to be available to the public. The Defendants have been aware of Plaintiff

Haulmark's disability for at least two years, understood about the requested modifications

to their policies, and received his requests for auxiliary aids and services to be provided to

grant Plaintiff Haulmark effective communication and equal participation in their

programs, services, and activities.

11.     "A public entity shall take appropriate steps to ensure that communications

with applicants, participants, members of the public, and companions with disabilities are

as effective as communications with others." 28 C.F.R. § 35.160(a)(1); "A public entity shall

furnish appropriate auxiliary aids and services where necessary to afford qualified

individuals with disabilities ... an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1)

12.    "To withstand dismissal on a Title II ADA claim, the plaintiff must allege that (1) [he] is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Hockaday v. Colorado Dep't of Corr.*, No. 18-1075, 4 (10th Cir. Mar. 5, 2019) (quoting *Cohon ex rel. Bass v. N.M. Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011) (Internal quotation marks omitted)

13.    The Plaintiff Haulmark is qualified as an individual with a disability, as the Defendants do not dispute. Secondly, it is not disputed that Plaintiff Haulmark is qualified to participate in the online broadcasting service. While admitting that the online broadcasting services are not compliant with the ADA in whole, the Defendants argue that online broadcasting services provide Plaintiff Haulmark with benefits in terms of meaningful access. The Defendants attempt to argue that Plaintiff Haulmark "will not be able to meet the very high deliberate indifference standard of the intentional discrimination claim."

14.    Defendants assert that Plaintiff Haulmark does not demonstrate that he has a clear and unequivocal right to relief including that sought in his Complaint and TRO.

15.    Plaintiff Haulmark has standing because (1) the online broadcasting services in question have been non-compliant with Title II of the ADA for years and 2) the new policy does not address their noncompliance with the ADA of the online broadcasting

services and previous archived audio and video content, "consisting of the activities including the legislative proceedings in the committee rooms within the Kansas State Capitol[,]" (See ¶ 4 in Complaint) 3) and the request for compensatory damages is properly pursued.

## III. STRUCTURE OF THE KANSAS
## LEGISLATIVE INFORMATION SERVICES SYSTEM

16.     Kansas Legislative Information Services System (hereinafter "KLISS") includes a major component that provides the ability to stream audio and visual content online. (See Exhibit #8-10 of Docket No. 1-1 (Page 19-21 of 34)) ("Also included in this budget are the costs to run the Kansas Legislative Information Services System, which includes the website for the Legislature and the streaming of legislative meetings on the web.") This major component is known as online broadcasting services as it pertains to the KLISS. In recent years, the Kansas Legislature's budget, including operating expenses for the KLISS, have averaged at least $20 million annually. (See Exhibit #8, #9, #10 in Docket No. 1-1 (Page 19-21 of 34))

17.     Until the COVID-19 pandemic, most, if not all, legislative proceedings took place at the Kansas State Capitol. The Defendants have developed and implemented two separate streaming platforms for public adoption: the Kansas Legislature website for audio-only content, and the YouTube Channel[1] for audiovisual content. All that is necessary for someone to access these two streaming platforms free of charge is to have access to an internet-enabled electronic device.

---

[1] KS Legislature, ("YouTube Channel"), https://www.youtube.com/channel/UC_0NO-Pb96CFABvxDwXAq8A

18.    It is unclear at this time when the legislature chambers began to contain audiovisual equipment that could be streamed and published on the YouTube Channel to enable members of the public to observe and follow the legislative proceedings from each of the two state legislative chambers. For two years prior to the publication of this Kansas City Star article in February 2019, the legislative committee rooms were fitted by Defendant LAS and Defendant Tom Day with audio equipment that broadcast audio-only content from the Kansas Legislative website for Kansas citizens to listen to. (See ¶ 36 in Complaint) (See Exhibit #5 of Docket No. 1-1 (Page 8-9 of 34)) ("Only the House of Representatives and the Senate are carried live via YouTube. Committee hearings, on the other hand, are available only through online audio.") During this time period just prior to the COVID-19 outbreak, it was not possible to remotely participate and engage in these legislative proceedings in a virtual setting since there was not a major component of KLISS designed to allow this.

19.    It is reiterated that the Defendants did not comply with Title II of the ADA when they designed and implemented these online broadcasting services by ensuring that these services are readily accessible to individuals with a hearing disability. When the audiovisual content was published on the YouTube Channel, *some* of those videos had automatic captions generated for them by YouTube's free captioning services. These videos, with automatic captions generated by the software, fail to provide Plaintiff Haulmark with effective communication and equal participation. Many of those archived videos are still available without the automatic captioning because they did not satisfy the conditions to trigger YouTube's automated creation of the captions. These videos continue

to be accessible to members of the public without the captioning to exclude Plaintiff Haulmark because of his hearing disability. Even though all audio content has been archived on the website of the Kansas Legislature, no auxiliary aids or services have been provided so as to ensure effective communication and to ensure equal participation for Plaintiff Haulmark.

20.     When COVID-19 spread in the United States, the Defendants adopted the necessary health guidelines, which included the requirement to maintain social distancing. The Kansas Legislature established the use of video conferencing via the software platform Zoom so elected officials and legislative staff could participate remotely and engage with each other. The Defendants broadcasted the content of Zoom sessions on the Youtube Channel. Many of these videos that contain the content of Zoom sessions are captioned automatically by Youtube. The Kansas Legislature's website does not feature captioning or transcripts of the audio-only content of these Zoom sessions. (See Page 1 of 3 on Report to the Kansas Legislative Coordinating Council, Kansas Virtual Statehouse Project, by Tom Day[ ]and Alan Weis[,] of the Day Exhibit B in Docket No. 14-2 (Page 8 of 198)) ("Zoom was used through late March, April and May for legislative committee meetings where all participants were remote on the video conference and the committee rooms were not used. The Zoom system allowed the streaming of the video conference meetings to the Legislature's YouTube Channel for public viewing. We also were able to stream the audio to our website audio archive system. These meetings worked fairly well considering the short time we had to prepare and implement the technologies. Legislators and staff seemed to adopt the use of the Zoom system without much trouble.")

21.     By the end of the year 2020, the Defendants initiated the modification of the KLISS with the "$2.74 Million Kansas Virtual Statehouse Project" to enable the elected legislators and staff of the legislature to actively participate in an online virtual environment. According to this modification, their physical presence is no longer required inside the chambers and committee rooms of the legislature. (See No. 1-19 under Specifications for Virtual Statehous Project on Page 13-14 of 19 of Exhibit E in Docket No. 14-2 (Page 39-40 of 198))

22.     This $2.74 million dollar project includes installing equipment capable of streaming video and audio "in all thirteen separate committee rooms, two legislative chambers, ten conference and training rooms and two rooms in the visitor center." (See Page 6 of Defendants' Opposition) With the new modifications of the KLISS, the elected legislators, staff of the legislature, and members of the public can engage in two-way activities by engaging in online virtual sessions as active participants while using their equipment, such as computers, laptops, and other electronic devices. (See Report to the Kansas Legislative Coordinating Council, Kansas Virtual Statehouse Project, by Tom Day[ ]and Alan Weis[,] of the Day Exhibit C in Docket No. 14-2 (Page 21 of 198)); (See under Objective on Page 2 of 19 of Exhibit E in Docket 14-2 (Page 28 of 198)) ("The Kansas Virtual Statehouse project will allow the public to participate in the Kansas Legislative process from anywhere in the state using virtual technologies. The virtual technologies will create a secure environment that will allow legislators, staff, and the public to interact from any location using video, audio, and shared computer screens. The Statehouse Chambers and Committee rooms will be equipped with professional video

conference systems that will enhance transparency and meet accessibility standards. This will allow remote testimony from anywhere connectivity and the technology is available. The video and audio of video conferences will the [sic] streamed to the public network for unlimited public viewing along with other legislative proceedings under existing or future streaming services utilized by the Legislature.")

23.     The comparison between before and after the global pandemic indicates that the legislators, staff of the legislature, and the members of the public were only able to observe the legislative proceedings through the online broadcasting services but were unable to directly participate in these legislative proceedings remotely. With the addition of new functional components to the KLISS through the $2.74 million dollar project, these elected legislators are now able to remotely and virtually disperse and participate in the legislative activities. As the original technological component, the online broadcasting services continue to provide the public view-only access, depriving Plaintiff Haulmark and other individuals with a hearing disability of effective communication access and equal participation in the same legislative proceedings.

24.     Plaintiff Haulmark filed the TRO and exhibits to ensure that the years-old online broadcasting service, as a component with a purpose of only providing public access, is fully compliant with the ADA. The proposed order attached to the TRO is only tailored to the specific component of the KLISS known as the online broadcasting services. This component continues to be utilized after the "$2.74 Million Kansas Virtual Statehouse Project" has been completed. The proposed order of Plaintiff Haulmark does not intend to

impair, restrain, or interfere with the other components of the KLISS in such a way as to affect the operations of the legislative processes in Kansas.

## IV. REQUESTS FOR ADA ACCOMMODATIONS

25.     The Defendants argue that "the ADA does not require a public entity to adopt any particular form of accommodation[ and that] the Legislature already has a policy of offering ADA accommodations upon request[.]" (See Page 2, First Continuing Paragraph in Defendants' Opposition) They add that they already have policies in place that Plaintiff Haulmark requested within the Complaint and the TRO. Additionally, the Defendants assert that a policy was adopted by the Legislative Coordinating Council on December 19, 2018 for Defendant Tom Day to be authorized "to work towards improving the quality of legislative proceedings made available on the Internet, including addressing concerns about accessibility." (See Page 7, First Paragraph in Defendants' Opposition) They argue that their policies are in compliance with the ADA and ITEC Policy 1210. Moreover, they argue that Plaintiff Haulmark does not demonstrate "good likelihood of being injured in the future." The Defendants argue that Defendant Tom Day was under the direction of the Legislative Coordinating Council (hereinafter "LCC") and assert that the federal law has not been repeatedly violated. The Defendants continue to maintain that Plaintiff Haulmark is requesting "modifications that would fundamentally alter the nature of [the state legislature's] program or activity." (To support this entire paragraph, see Page 12-13 in Defendants' Opposition)

26.     The ITEC Policy 1210 had been implemented long before Plaintiff Haulmark had contacted the Defendants for the first time. (See ¶ 35 in Complaint) The Defendants

also acknowledge this fact. (See Page 4, Last Paragraph in Defendants' Opposition) (" [...] consistent with the State's Policy (ITEC Policy 1210) that state technology projects be ADA-compliant, [...] "); (See Page 9, First Continuing Paragraph in Defendants' Opposition) ("State technology projects are required to be ADA-compliant as per ITEC Policy 1210."); (See ¶ 3 in Declaration of Alan Weis) (Docket No. 14-3) ("All state technology projects follow policies adopted by the Information Technology Executive Council ("ITEC"), including ITEC Policy 1210 Revision 3, which includes the provision that: 6.1. All entity ICT shall be accessible to and usable by individuals with disabilities in accordance with federal and state law.") (Internal quotation marks omitted)

27.     Having the policies in place is not the same thing as complying with them. The Defendants have refused to comply with the ITEC policy long before Plaintiff Haulmark requested that the ADA non-compliant online broadcast services be readily accessible for Plaintiff Haulmark and others with hearing disabilities. Again, the Defendants argue that they have policies in place, but do not provide evidence of how they are currently meeting the requirements of the ADA law. Additionally, if they had adhered to this ITEC policy, the online broadcasting services would have been readily accessible to individuals who have a hearing disability and Plaintiff Haulmark would not have needed to submit a request for accessibility under the ADA. Instead, *inter alia*, the Defendants are not committed to accommodate individuals with a hearing disability.

28.     The Defendants admits Defendant Legislative Administrative Services (hereinafter "LAS") and Defendant Tom Day are responsible for operating this online broadcasting services, as the streaming component of KLISS. The ADA page of the Kansas

Legislature's website clearly states that LAS is responsible for receiving ADA requests. (See ¶ 15 in Complaint) (See Exhibit #1 of the Docket No. 1-1 (Page 3 of 34))

29.    Within the context of the notices from many different legislative committees, here are the commonly used instructions for the ADA requests: "Any individual with a disability may request accommodation in order to participate in committee meetings. Requests for accommodation should be made at least two working days in advance of the meeting by contacting Legislative Administrative Services at (785) 296-2391 TTY: 711" (See at Bottom of Exhibit #14 of the Docket No. 1-1) (See Bottom of House Committee Agenda[2]) (See Bottom of First Page of Joint Committee on Administrative Rules and Regulations[3]) (See Bottom of Senate Committee[4])

30.    In the Defendants' Opposition, the Defendants do not provide any other alternative persons or entities to whom the ADA requests should be sent to so that any requested modifications or accommodations can be granted to individuals with disabilities. Furthermore, there is no grievance procedure shown to be in place for when an accommodation request has been denied.

31.    The ultimate authority for granting and providing the necessary auxiliary aids and services for Plaintiff Haulmark and others with disabilities rests with Defendant Tom Day. (See ¶ 15 in the Declaration of Thomas (Tom) A. Day (hereinafter "Declaration of

---

[2] House Committee Agenda,
http://www.kslegislature.org/li_2020/b2019_20/committees/ctte_h_tax_1/documents/agenda/weekly/20200517.pdf
[3] Joint Committee on Administrative Rules and Regulations,
http://www.kslegislature.org/li_2020/b2019_20/committees/ctte_jt_rules_regs_1/documents/agenda/weeklyinterim/20191120.pdf
[4] Senate Committee,
http://www.kslegislature.org/li_2020/b2019_20/committees/ctte_s_assess_tax_1/documents/agenda/weekly/20200209.pdf

Tom Day")) (Docket No. 14-2) ("I am designated person to whom ADA accommodation requests are to be sent.") Reiterated and ascertainable, Defendant Tom Day stands alone as a public officer[5] responsible for receiving and acting on ADA requests as an administrative duty for individuals with a disability who wishes to participate in and benefit from these services, programs, and activities in the public interest. LCC has appointed Defendant Tom Day to carry out the responsibilities of providing ADA accommodations as one of his administrative duties for the Kansas Legislature. (See Page 8, First Paragraph in Defendants' Opposition) ("LAS and its Director Tom Day carry out administrative duties for the Legislature upon directions from the LCC.") The failure to respond to modification requests and the failure to implement the auxiliary aids and services that were requested by the injured party were and will be attributed to Defendant Tom Day. Additionally, the ADA imposes non-delegable duties onto Defendant Tom Day not to discriminate.

32.    After Plaintiff Haulmark made a request pursuant to the Kansas Open Records Act, Defendant Tom Day refused by denying all requests to produce and furnish transcripts of all the audio recordings for the 2019 Legislative Session. (See ¶ 39-41 in Complaint) Then Defendant Tom Day invited Plaintiff Haulmark to a meeting to discuss Plaintiff Haulmark's access requests. (See Page 2 of 2, First Paragraph of the Exhibit #7 in

---

[5] *Durflinger v. Artiles*, 234 Kan. 484, 673 P.2d 86 (Kan. 1983), concluded that the essential characteristics of 'public office' are: (1) a position created by statute or ordinance, (2) a fixed tenure, and (3) the power to exercise some portion of the sovereign function of government. "Essential elements to establish public position as `public office' are: position must be created by constitution, legislature, or through authority conferred by legislature, portion of sovereign power of government must be delegated to position, duties and powers must be defined, directly or impliedly, by legislature or through legislative authority, duties must be performed independently without control of superior power other than law, and position must have some permanency and continuity." *Durflinger* at 503 (Internal quotations retained)

Docket No. 1-1 (Page 18 of 34)) ("We would like to meet with you to further discuss your concerns if mutually agreeable arrangements can be made.") According to the Defendants' Opposition, their meetings with individuals with disabilities are treated as interactive process sessions under the regulations of Title I of the ADA. (See Page 8, Last Paragraph of the Defendants' Opposition) ("The Legislature works to meet the needs of disabled individuals, providing reasonable accommodations through auxiliary aids appropriate to the individual requestor's needs upon request as per the notice through an interactive process, as contemplated by the ADA.") The Defendants emphasized with *Kiman v. New Hampshire Dept. of Corrections*, 451 F.3d 274 (1st Cir. 2006) in order to argue that a request was necessary to trigger the application of the ADA to a prison system. (See Page 19, Continuing Paragraph from Last in Defendants' Opposition) ("The ADA's reasonable accommodation requirement usually does not apply unless triggered by a request.") (Internal quotations omitted) Accordingly, Plaintiff Haulmark filed numerous ADA requests for access to the online broadcasting services and the archived audio-only content over the past two years. All the requests were turned down by the Defendants.

33.     During this December 2019 meeting, an agreement was reached that the Defendant Tom Day would ensure effective communication and equal participation are provided to Plaintiff Haulmark during the 2020 Legislative Session. (See ¶¶ 46-47 in Complaint) However, Defendant Tom Day did not adhere to the agreement by failing to timely communicate with Plaintiff Haulmark then refusing to provide effective communication and equal participation to Plaintiff Haulmark during the 2020 Legislative Session. (See Page 1-3 of the Exhibit #13 in Docket No. 1-1 (Page 26 of 34)) During the

ongoing 2020 Legislative Session, Defendant Tom Day delayed Plaintiff Haulmark's transcript requests under the ADA, which Defendant Tom Day then refused to honor. (See Page 1-2 of the Exhibit #15 in Docket No. 1-1 (Page 30 of 34))

34.     The Defendants state that Plaintiff Haulmark has not "made a request for accommodation since the start of the 2021 Kansas Legislative Session on January 11, 2021." (See Page 11, First Paragraph in Defendants' Opposition) ("Haulmark does not allege that he made a request for accommodation since the start of the 2021 Kansas Legislative Session on January 11, 2021.") The Defendants argue that Plaintiff has not provided a bill of interest. (See Page 11, First Paragraph in Defendants' Opposition) ("Neither the Motion nor Haulmark's affidavit point to any particular bill of interest that came before the Legislature in the January 11-15, 2021 period that he was unable to participate in, or that was subject to any critical, time-sensitive proceedings during that week.") Defendant Tom Day stated that he never received the February 18, 2019 letter, which requested that the online broadcasting services be readily accessible for Plaintiff Haulmark, and that Defendant Tom Day saw the letter was "included with a legal filing by [Plaintiff Haulmark.]" (See ¶ 20 in Declaration of Tom Day) (See Exhibit #4 of Docket No. 1-1 (Page 6-7 of 34))

35.     Additionally, Defendant Tom Day acknowledges that Plaintiff Haulmark had requested transcripts for the archived audio content pursuant to the Kansas Open Records Act, K.S.A. § 45-215 *et seq.*, (hereinafter "KORA"). (See ¶ 21 in Declaration of Tom Day) In accordance with K.S.A. § 45-218(f), a requestor may be charged or required to pay an advance fee in order to gain access to or copies of public records. Title II of the ADA

requires that transcription services cannot be charged to Plaintiff Haulmark as an auxiliary aid or service. 28 CFR § 35.130(f) ("A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part.") According to the KORA, by denying Plaintiff Haulmark's request for these transcripts, Defendant Tom Day intentionally imposed a discriminatory restriction on access to the archived audio files that consist of legislative proceedings. (See ¶ 41 in Complaint) (See ¶ 22 in Declaration of Tom Day) Furthermore, the Defendants misconstrue their demands of smaller requests to be one of the "reasonable and appropriate accommodations" offered to Plaintiff Haulmark. (See Page 12, First Continuing Paragraph in Defendants' Opposition)  The Defendants instead are creating unnecessary obstacles for Plaintiff Haulmark by issuing these demands.

36.    For the 2021 Legislative session, the Defendants are attempting to nullify the prior ADA requests, including those for transcripts, because these requests contain the terms "100% accurate" and "errorless". (See Page 25, First Paragraph in Defendants' Opposition) Further, while the Defendants attempt to disregard and eliminate all previous ADA requests, they insist there must be new requests from Plaintiff Haulmark after the 2021 Legislative Session has commenced. (See Page 11, First Paragraph in Defendants' Opposition)

37.     As one of other online broadcasting services offered to the public, the website of the C-SPAN television network provides exceptionally accurate real-time captioning in their videos and publishes transcripts to ensure that individuals with hearing disabilities will be able to access the same information that others without hearing disabilities receive. (See ¶ 5 in Exhibit #1 of Docket No. 5-1 (Page 3 of 7)) Additionally, other local governments provide real-time captioning. (See ¶ 24 in Complaint) These examples confirm that the Defendants are capable of producing real-time captioning and publishing transcripts to be optimally accurate as requested by Plaintiff Haulmark.

38.     As a side note, Defendant Tom Day asserts that Plaintiff Haulmark never has made a smaller request for effective communication access. (See ¶ 22 in Declaration of Tom Day) While this is a blatantly false statement by Defendant Tom Day, Plaintiff Haulmark requested for a transcript to a meeting held by the Legislative Coordinating Council on April 8, 2020. (See ¶ 53 in Complaint) Plaintiff Haulmark sent a follow-up email to Defendant Tom Day containing a request for the transcript of this same meeting held by the Legislative Coordinating Council. (See ¶ 54 in Complaint) This meeting held by the Legislative Coordinating Council lasted 1 hour and 22 minutes long. (See Exhibit #3 of the Docket No. 1-1 (Page 5 of 34)) After Plaintiff Haulmark sent a follow up email, Defendant Tom Day flatly refused to produce and provide a transcript for this specific meeting held by the Legislative Coordinating Council. (See ¶ 55 in Complaint) This has been the last futile attempt to communicate with the Defendants regarding the noncompliant online broadcasting services and the archived audio recordings and videos.

39.     After refusing to respond to and then denying Plaintiff Haulmark's requests, the Defendants did not offer Plaintiff Haulmark any other auxiliary aids or accommodations to provide meaningful access for Plaintiff Haulmark to benefit from the online broadcasting services. (See ¶ 41, 51, 55, and 59 in Complaint) Instead of prohibiting discrimination, the Defendants are segregating Plaintiff Haulmark because of his hearing disability by demanding that he provide a list of certain bills, committee meetings, and anything else legislation-wide which may be required for the Defendants to act. (See Page 10 in Defendants' Opposition) ("Although Haulmark mentioned to Day in one email that he was following bills, Haulmark never identified any specific bills he was following or requested assistance relating to those bills."); (See Page 11 in Defendants' Opposition) ("Neither the Motion nor Haulmark's affidavit point to any particular bill of interest that came before the Legislature in the January 11-15, 2021 period that he was unable to participate in, or that was subject to any critical, time-sensitive proceedings during that week."); (See Page 10 in Defendants' Opposition) ("Haulmark's Motion fails to identify any time-sensitive matter regarding a bill heard between January 11 and January 15, 2021, that he has missed out on due to any issues with the YouTube captioning."); (See Page 10 in Defendants' Opposition) ("Nor did Haulmark ever explain why or why production of every single proceeding was necessary for meaningful access to the specific bills he may have been following, bills which were never identified."); (See ¶ 22 in Declaration of Tom Day) ("Mr. Haulmark never told me what those bills were or asked me for information about those specific bills. If he had, I would have provided it.")

40.    The U.S. Supreme Court has discussed about the ADA's integration mandate and concluded that the discrimination forbidden under Title II of the ADA includes "unjustified isolation of individuals with disabilities" *Olmstead v. L. C*, 527 U.S. 581, 582 (1999) "The ADA both requires all public entities to refrain from discrimination [ ... ] and specifically identifies unjustified segregation of persons with disabilities as a form of discrimination[.] " *Olmstead* (citing 42 U.S.C. § 12132, 12101(a)(2), 12101(a)(5)) (Internal quotation marks omitted)

41.    The Defendants' assertion that they did not discriminate against Plaintiff Haulmark because Plaintiff Haulmark has not narrowed his original requests of the entire online broadcasting services and the audio recordings and videos to specific certain bills, committee meetings, or other specific legislative elements misses the point. "Before a public entity can be required under the ADA to provide a disabled individual an auxiliary aid or service, a public entity must have knowledge of the individual's disability and the individual's need for an accommodation." *Robertson v. Las Animas*, 500 F.3d 1185, 1196 (10th Cir. 2007)

42.    Defendant Tom Day has shown that he has been aware about the obvious need of captioning for the online broadcasting services during the month of February 2019. (See ¶ 36 in Complaint) In addition, Defendant Tom Day has shared since February 2019 that it has always been possible for captioning to be enabled for the online broadcasting services and that transcripts can be produced and provided. In other words, if it were not possible to provide captioning or produce and publish transcripts, it would be impossible to determine how much these services cost. (See Exhibit #5 of Docket No. 1-1 (Page 8-9 of

34)) ("The biggest items are $182,000 for closed-captioning and $200,000 for rewiring committee rooms." "Thomas Day, director of Legislative Administrative Services (LAS), the entity that would be responsible for outfitting committee rooms for broadcast, said one of his main concerns is the cost of closed captioning, which runs around $3 per minute."); (See First Page, Second Paragraph in Exhibit #7, Docket No. 1-1 (Page 17 of 34)) ("The second part of your request, to provide professional transcriptions of hundreds of committee meetings at an approximate minimum cost of $2.45 per minute, for approximately 62,528 minutes of recording, totals at least $15,194.") It is evident that Defendant Tom Day completed the fact specific investigations to determine an appropriate aid or service for Plaintiff Haulmark and other individuals with a hearing disability. Due to his parsimonious nature, Defendant Tom Day has refused to enable the captioning services or to produce transcripts despite numerous requests from Plaintiff Haulmark.

43.     The 10th Circuit has answered this question: "[D]oes a public entity violate Title II [ … ] repeatedly until it affirmatively acts to remedy the non-compliant service, program, or activity?" *Hamer v. City of Trinidad*, 924 F.3d 1093, 1097 (10th Cir. 2019) In this case, the plaintiff is an individual with a physical disability, who relied upon a motorized wheelchair, and who wished to benefit from the City created sidewalks as an entire service, program, or activity. "[E]ach time a qualified individual with a disability encounters or actually becomes aware of a non-compliant service, program, or activity and is thereby deterred from utilizing that service, program, or activity, he or she suffers discrimination and a cognizable injury." *Id*. at 1107 (Internal quotation marks omitted) (citations omitted)

44.     Prior to the decision of the Tenth Circuit on the statute of limitations, the rulings in the court for the district of Colorado discussed how thousands of the curb ramps and curb cuts all over the city must be fully accessible for this plaintiff to gain the benefit of utilizing that service, program, or activity. *Hamer v. City of Trinidad*, Civil Action No. 16-cv-02545-NYW, 12-3 (D. Colo. Dec. 1, 2017)

45.     The Defendants have an affirmative obligation under Title II to ensure that all audio and audiovisual content made available through their online broadcasting services are accessible to Plaintiff Haulmark and others with a hearing disability. "Title II therefore imposes an affirmative obligation to accommodate persons with disabilities." *Hamer,* 924 F.3d, 1104-5 (Quoting *Tennessee v. Lane*, 541 U.S. 509, 533 (2004)) (Internal quotation marks omitted)

46.     The district court in *Pierce v. Dist. of Columbia*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) rejected the argument that Defendants only needed to provide accommodations when they were explicitly requested. ("[N]othing in the disability discrimination statutes even remotely suggests that covered entities have the option of being passive in their approach to disabled individuals as far as the provision of accommodations is concerned. Title II [mandates] that entities act *affirmatively* to evaluate the programs and services they offer and to ensure that people with disabilities will have meaningful access to those services.") (Emphasis retained) (citations omitted); *Hamer*, 924 F.3d at 1106 (mentioning "Congress's goal[] of full participation" in enacting the ADA and "[w]hat matters is whether the individual can fully participate *now* in the service, program, or activity." (Emphasis retained))

47.     Because Defendant Tom Day has not taken affirmative actions to ensure that the audio and audiovisual content available through the online broadcasting services are in compliance with Title II of the ADA, Plaintiff Haulmark has been prevented from accessing those audio and audiovisual content by using the online broadcasting services since its implementation because of his hearing disability. Despite the fact that it has been obvious to Defendant Tom Day for captioning for the online broadcast services to be required, it has been necessary for Plaintiff Haulmark to go through exhausting steps to persuade the Defendants to bring their services, programs, and activities into compliance with Title II of the ADA and for the real-time captioning to be activated. (See ¶ 33 in Complaint) (See Exhibit #4 of Docket No. 1-1 (Page 6-7 of 34)) (See Exhibit D of the Writ of the Mandamus, Kansas Supreme Court, Appellate Case No. 19-121312-S[6]) (See Page 6 of 7, First Paragraph in Exhibit #6 of Docket No. 1-1 (Page 15 of 34)) ("At the date of this letter and my previous requests starting with a letter dated Feb. 18, 2019, none of the archived Audio-only content is captioned and the transcriptions are not openly available for the Deaf and Hard of Hearing individuals on the Kansas Legislature website.") As repeated requests and before he commenced this federal lawsuit, Plaintiff Haulmark filed for a Writ of Mandamus, made a Kansas Open Records Act request asking for compliance with the ADA, and sent an email for the final time to Defendant Tom Day on April 10, 2020, three days after being turned down for production of the requested transcripts. (See Complaint at ¶¶ 33, 38, 39, and 55)

---

[6] Kansas Supreme Court, *Appellate Case No. 19-121312-S*, http://sigd.net/Haulmark-KSC-19-121312-S.pdf

48.     The Defendants have known for a long time in regards to the shortcomings of online broadcasting services, as well as the need for real-time captioning and transcripts. Additionally, Defendant Tom Day has shared the needs for captioning services. "[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation." *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1299 (10th Cir. 2016) (quoting *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1197-98 (10th Cir. 2007) ("When a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal to the ADA claim.") (Internal quotations retained))

## V. REASONABLE MODIFICATIONS TO AVOID DISCRIMINATION

49.     Thirty years ago, the U.S. "Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001) "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." *Martin* at 675 (citing 42 U.S.C. §§ 12111-12117; 42 U.S.C. §§ 12131-12165; 42 U.S.C. §§ 12181-12189)

50.     Title II, at issue here, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132

51.     The First Amendment is meant to do more than to protect democracy; it is to promote a democratic culture. The First Amendment guarantees all individuals and groups their right to create and express their respective cultures, in addition to their ability to influence each other through participation. To make the power of the state accountable to the people who live in it is to protect freedom of expression. The freedom of expression is intended for the people to have a say over the development of the forms of power both undergird and transcend the state. In a free society, people should have the right to participate in the forms of meaning-making that shape who they are and help define who they are as individuals. Thus, the First Amendment not only helps to ensure political democracy, but it also helps to ensure cultural democracy.

52.     Plaintiff Haulmark refers to himself as "Deaf" when referring to individuals, in this case himself, who are culturally deaf and express themselves primarily through visual languages[7]. Plaintiff Haulmark uses written English as one of the visual languages to convey his thoughts, feelings, perspectives, opinions, and beliefs about ourselves and the world around us to the hearing population, as can be seen in this and previous legal filings. Since Plaintiff Haulmark is seeking to make widely known the Deaf community's language, culture, arts, and history, he must be permitted to use his First Amendment rights to shape the power of his state to strengthen the Deaf community. The state government, including the legislature, has enormous power to shape the society through which Plaintiff Haulmark and other Deaf people traverse. In order to engage in protected

---

[7]This label is contrary to the term "hearing impaired" which is generally applied in a demeaning tone to obliterate the personal history, background, cultural abundance, and visual language of this particular member of the Deaf community. The Kansas Legislature has accepted this by lawfully legislating the name change from Kansas Commission for the Deaf and Hearing Impaired to Kansas Commission for the Deaf and Hard of Hearing. K.S.A. § 75-5397b (1992).

First Amendment activities, Plaintiff Haulmark needs the Defendants to make reasonable modifications on his behalf, so that he may obtain the accommodations necessary to pursue his protected rights under the Fourteenth Amendment.

53.     The Kansas State Capitol building is currently closed to the public due to the COVID-19 pandemic which prevents Plaintiff Haulmark and anyone else from observing the legislative proceedings in person. Having been prevented from making a physical visit, and being unable to view the legislative proceedings through online broadcast services, presents a constitutional question for this Court to answer. As a result of the quality of the sound equipment installed in the legislative chambers and the committee rooms, individuals without a hearing disability are able to hear the same information, obtained through the online broadcasting services, with an optimal degree of accuracy. They also have the ability to utilize their constitutional right to petition their representatives and ensure that the highest standards are being met.

54.     Title II of the ADA ensures that individuals with a hearing disability would not be excluded from accessing the same information through the online broadcast services of equal optimal degree of accuracy as these individuals without a hearing disability. As such, the Defendants must still take any action necessary to ensure optimal equality between the individuals without a hearing disability and the individuals with a hearing disability, or as close to the optimal equality as possible. Whether captioned or transcribed in real-time, these auxiliary aids or services must be intended to ensure that the audio and video content are equally optimally accurate as what individuals without a hearing disability would hear.

55.     "To effectuate Title II's mandate, the regulations require public entities to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." *Robertson*, 500 F.3d 1185, 1195 (quoting 28 C.F.R. § 35.130(b)(7)) (Internal quotation marks omitted) Plaintiff Haulmark and other individuals with a hearing disability are entitled to the following auxiliary aids and services: "[q]ualified interpreters, notetakers, *transcription services*, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, *open and closed captioning*, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods . . . ." 28 C.F.R. § 35.104. (Emphasis added)

56.     There is an exception under 28 C.F.R. § 35.164 that a public entity need not take any action that would result in an undue administrative burden. The public entity has the burden to prove that a proposed action would result in undue burden or fundamental alteration, and the decision "must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion." 28 C.F.R. § 35.164

57.     But even if an action would result in an undue administrative burden, "the public entity must take any *other* action that would not result in such burdens but would nevertheless ensure that, *to the maximum extent possible*, individuals with disabilities receive the benefits or services provided by the public entity." *Robertson* at 1199 (quoting 28 C.F.R. § 35.164) (Emphases retained)

58.     Here, the Defendants took no *other* action in response to Plaintiff Haulmark's requests to provide effective communication access to the online broadcasting services. Instead of complying with the ADA and their own ITEC policy, they conducted discriminatory acts by demanding for more specific requests from Plaintiff Haulmark, then denying to produce and provide transcripts. Plaintiff Haulmark also submitted a smaller ADA request for the April 2020 meeting of the Legislative Coordinating Council, but it was denied. (See ¶ 38 in this Reply)

59.     The Defendants' inaction when it comes to modifying their policies to provide the real-time captioning and transcripts disproportionately burdened Plaintiff Haulmark as an individual with a hearing disability. As a result, the Defendants deprived him of meaningful access to all of their services and benefits. "A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1) "A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1)

60.     The ADA "does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens.[ … ]The decision that compliance would result in such alteration or burdens must be made by the head of the

public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion." 28 CFR § 35.164

61.     The Defendants fail to submit any written statement from Defendant Tom Day as the head of the public entity explaining the reasons why the proposed action amounts to an undue burden or a fundamental alteration. Here, the Defendants cannot disprove Plaintiff Haulmark' allegations while merely asserting fundamental alteration or undue burden, since such claims are affirmative defenses for which the asserting public entity bears the burden of proof. To prevail on this affirmative defense, Defendants must adduce these sufficient facts to prove that Plaintiff Haulmark's requests for real-time captioning and transcripts would result in a fundamental alteration to the Defendants' online broadcasting services or result in an undue burden. The Defendants would additionally have to adduce facts sufficient to prove that they took some *other* action to "ensure that, to the maximum extent possible," Plaintiff Haulmark was still able to receive the benefits of their services. 28 C.F.R. § 35.164 The Defendants have not done so. Additionally, the Defendants do not provide a legitimate, nondiscriminatory reason for defying the federal law after Plaintiff Haulmark has sought ADA accommodations numerous times since January 2019 for the real-time captioning and transcripts.

62.     "In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in

accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b)(2)

63.    Plaintiff Haulmark specifically requested in his February 2019 letter for "real-time English captions" for the online broadcasting services. (See ¶ 33 in Complaint) (See Exhibit #4 of Docket No. 1-1 (Page 6 of 34)) Later, Plaintiff Haulmark requested transcripts to be produced and furnished to enable effective communication with the archived audio recordings, which are posted on the Legislature's website for public access. (See ¶ 39 in Complaint) (See Exhibit #6 of Docket No. 1-1 (Page 10-16 of 34)) In violation of Plaintiff Haulmark's privacy and independence and before they are to affirmatively act, the Defendants demand that Plaintiff Haulmark provide a list of specific bills, committee meetings and other legislative elements. Additionally, they do not offer any other action to ensure that the Plaintiff Haulmark receives effective communication and equal participation to the online broadcasting services and the archived audio and audiovisual recordings.

64.    The Defendants attempt to confuse the KLISS's structure to create an illusion that the KLISS cannot function without the online broadcast service, a separate component designed to broadcast audio and audiovisual content of the legislative proceedings to the public at large. Because of their created confusion, they introduce the argument of how the Kansas Legislature does not waive Eleventh Amendment immunity. The Defendants misinterpret the intention behind the TRO as an "order that the Legislature stop its activities or be required to meet in person in a time of Global Pandemic." (See Page 15 in Defendants' Opposition)

65.     The proposed order requests that the available function of the real-time captioning be activated within the online broadcasting as required by the ADA. If this Court awards Plaintiff Haulmark's TRO and if the Defendants refuse to provide real-time captioning then only the component as the online broadcasting services, which is part of KLISS, would be halted. The remaining components of KLISS, making it possible for elected legislators, staff members, and guests to remotely meet and engage, would continue to function. Due to the fact that online broadcasting services are unavailable, the public will be unable to watch the legislative proceedings in real time. In addition, the current state policy of barring the public from physically visiting the committee rooms and the chambers of the legislature causes a constitutional issue for all.

66.     It is not disputed that the Defendants offer online broadcasting services to anyone interested in remotely watching legislative proceedings. Title II of the ADA requires public entities to furnish auxiliary aids that provide individuals with disabilities "*equal* opportunit[ies]" to avail themselves of the entity's services. 28 C.F.R. § 35.160 (Emphasis added) As such, holding otherwise would contradict the plain language of Title II of the ADA, which specifically lists "real-time captioning" and "real-time computer-assisted transcription services" as auxiliary aids and services. 28 C.F.R § 35.104

67.     Plaintiff Haulmark seeks protection from the ADA to exercise not just his constitutional rights to participate in the democratic process, but also to engage in the political process as equally as those without a hearing disability. There has been a pattern of the Defendants denying Plaintiff Haulmark timely access to observe these crucial

legislative activities, leaving Plaintiff Haulmark unable to take part in the democratic political process.

68.     As the Tenth Circuit has stated, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Verlo v. Martinez*, 820 F.3d 1113 (10th Cir. 2016) at 1127 (quoting *Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) at 1132)

69.     By means of this TRO, Plaintiff Haulmark requests vital information, knowing that "[a]ll legislative activity fundamentally transforms the lives of community leaders and constituents." (See ¶ 26 in Complaint) The Kansas Legislature's decision to share these legislative activities in real-time underscores the fact that information regarding these transformations is constantly evolving and Kansans should have access to the latest information regarding these activities. Without immediate implementation of the real-time captioning with the online broadcasting services providing observations to these legislative activities, Plaintiff Haulmark will suffer actual and imminent harm, which cannot be avoided if this Court waits until after the trial to resolve the harm.

70.     The Defendants have submitted an opinion of Alan Weis, not of an expert nature, as to the accuracy of the captioning. (See ¶ 7 in Declaration of Alan Weis) ("I did have occasion to look at the YouTube captioning that was provided and it appeared to me to be surprisingly accurate considering the uncommon and unusual terms that are used in discussing legislation and policies.") While sign language interpreters, captioners, transcribers, and ADA coordinators undergo rigorous training and certification processes, the Defendants did not provide documentation proving how Alan Weis is qualified or understands the general requirements of communicating effectively and ensuring equal

participation in order for individuals with a hearing disability to benefit from the

Defendants' services, programs, or activities in accordance with Title II of the ADA.

71.   As Youtube's automatic captioning software is not advertised to be intended

to be ADA compliant, the automatic machine-generated captioning continues to be

ineffective in ensuring effective communication accessibility and equal participation for

any individuals with a hearing disability. As there is no real-time captioning or transcripts

available for the audio-only content on the Kansas Legislature's website, the Defendants

claim that the automated captions included with *some* YouTube videos are sufficient to

provide meaningful access for Plaintiff Haulmark and those individuals with a hearing

disability. (Emphasis added) (See Page 7 in Defendants' Opposition) ("Usually, video and

audio from legislative proceedings are streamed to YouTube in near real time and given

auto-generated captions quickly, generally within 24-hours of posting.")

72.   The Defendants' lack of understanding of the terms "near real-time" and

"quickly" is evident when they describe the time-sensitive nature of the requested

*real-time* captioning and transcripts. Moreover, the Defendants other than presenting an

opinion of a non-expert do not discuss what Plaintiff Haulmark has pointed out about how

these automated captions are inaccurate. (See ¶ 20 in Complaint)

73.   It is true that Youtube's automatic captioning services are not managed by

the Defendants. (See Page 7 in Defendants' Opposition) ("Neither Day nor LAS controlled

the captioning of legislative proceedings posted on the Legislature's YouTube Channel.")

They simply upload the videos to the YouTube Channel and wait for the conditions

required by Youtube to trigger the automatic creation of the captions. Nevertheless, the Defendants admit they have control over where the audio and video content is published.

74.     The Defendants do not take responsibility, as required under the ADA, to ensure that there is accurate real-time captioning for these videos. Instead of using ADA non-compliant Youtube automatic captioning services, the Defendants must provide captioning on their own or through a third-party vendor implementing ADA-compliant captioning and transcription services, as a method to provide effective accessible communication to these videos to individuals with a hearing disability.

75.     As for years, the Defendants rely on Sliq Media Technologies for their online broadcasting service to stream the audio-only content to the public. (See ¶ 17 in Complaint) Plaintiff Haulmark has noted that even though it has not been activated, the current audio-only platform is capable of providing real-time captioning services. (See ¶ 18 in Complaint) The Defendants share that they plan to continue using Sliq Media Technologies as their platform. (See Page 6, Last Paragraph in Defendants' Opposition) ("The captioning is provided by the Webex system, which will be streamed into the Sliq system where the audio, video and text will be made available to the public."); (See ¶ 6 in Declaration of Alan Weis) ("The captioning is provided by the Webex system, which will be streamed into the existing software platform of Sliq Media Technologies where the audio, video and text will be made available to the public.")

76.     The Defendants assert that they rely on World Wide Technology (hereinafter "WWT") as a contractor, employing the captioning services of Cisco Webex to produce and supply captioning for only audiovisual content. (See ¶ 6 in Declaration of Alan Weis) The

Defendants assert that the contract of the $2.74 million dollars project is "to be complete on or before February 28, 2021." (See Page 6, Last Paragraph in Defendants' Opposition); (See Page 12, First Continuing Paragraph in Defendants' Opposition) ("[T]he $2.74 million Kansas Virtual Statehouse Project which will provide accurate real-time closed captioning on legislative proceedings streamed on the Internet.")

77.     In the Defendants' Opposition, there are multiple expressions of futurity, with promises of real-time captioning when in fact, real-time captioning is not activated currently. (See Page 12, Last Paragraph in Defendants' Opposition) ("[T]he Legislature is actively engaged in a project to provide the captioning[.]"); (See Page 13, First Continuing Paragraph in Defendants' Opposition) ("[T]he Legislature is completing the project as per policy. There is no point in ordering someone to do what has already been done."); (See Page 20, First Continuing Paragraph in Defendants' Opposition) ("[T]he system will provide real-time closed captioning through Sliq, which Haulmark admits has provided effective communication for the Arkansas and Virginia Legislatures."); (See Page 26, First Paragraph in Defendants' Opposition) ("Here Haulmark received accommodations: [ … ] now real-time closed captioning."); (See Page 29, First Continuing Paragraph in Defendants' Opposition) ("Going forward, the real-time accurate captioning will be provided and soon.")

78.     Since the $2.47 million project was completed on February 28, 2021, this project has proven fruitless so far in terms of providing real-time captioning services for audio and audiovisual content available on both the Kansas Legislature's website as well as its Youtube Channel. Since the requested modifications have not been made, the

policies, procedures, and practices relating to captioning requirements still are the same as they were before Plaintiff Haulmark contacted the Defendants in January, 2019.

79.     Although some videos which were published on the YouTube Channel have been provided with automatic machine-generated captions, Plaintiff Haulmark claims that they fail to provide *accurate* real-time captioning to ensure effective communication and an equal opportunity to benefit from the audiovisual content. The Defendants violated the ADA's prohibitions on disability-based discrimination. (Emphasis added) It is imperative for Plaintiff Haulmark to know exactly what every speaker is saying in these legislative proceedings. Each word plays a crucial role that has a ripple effect throughout the state. Additionally, knowing who is responsible for this ripple effect is imperative. Completely accurate captioning must be shared through the online broadcast services for Plaintiff Haulmark to be on an equal basis to others without a hearing disability. When captioning is not provided in real time for a video or audio stream it causes a delay in how Plaintiff Haulmark responds to information facilitated in real time to others. When the delay is excessive, the impact of the information provided has diminished since Plaintiff Haulmark is denied the opportunity to address these issues in real time. For Plaintiff Haulmark to obtain effective communication and equal participation in these online broadcasting services and to ensure full compliance with Title II of the ADA, all these videos must be captioned in an accurate manner and this must be done before or during the broadcasts. Not hours after but real-time.

80.     The previous policies of the Defendants and the new policy contained in the new "$2.74 Million Kansas Virtual Statehouse Project" do not moot Plaintiff Haulmark's

claim. This new policy incorporated into this $2.74 million project does not meet the minimum requirements of the regulations implementing the ADA. The required real-time captioning in the new Statehouse Virtual plan is not an unambiguous objective. There is no evidence to indicate that the Defendants are unambiguously committed to adhering to its latest policy in this Statehouse Virtual Plan to ensure they are in compliance with the ADA. The sequence of events here, coupled with the Defendants' description of its own policies and of this new plan, suggests that the requirement of captioning in this plan is not the result of substantial deliberation or commitment. Instead of being a long-term solution, this new policy is a temporary measure to "deal with" the inconvenience of litigation, a low level attempt to remain out of legal trouble.

81.     The "$2.74 Million Kansas Virtual Statehouse Project" fails on its face to meet Defendants' affirmative obligations under Title II of the ADA. Furthermore, the Defendants' promises in their Defendants' Opposition are broken like the other promises made before this lawsuit was filed.

82.     Lastly, 100% of the entire archived audio content, available on the Kansas Legislature website, do not contain any auxiliary aids or services to "achieve effective communication and equal participation for Plaintiff Haulmark and other individuals without a hearing disability." (See ¶ 37 in TRO)

## VI. REQUESTED RELIEF OF TRO

83.     The Defendants argue that *Cropp v. Laramie County, Colo*, No. 18-1262, 793 Fed. Appx. 771, 773 (10th Cir. 2019), undermines the injunctive relief requested by Plaintiff Haulmark. In *Cropp*, one of the plaintiffs did not continue to suffer injury after

being released from jail. The Tenth Circuit, in reviewing this case, did not examine whether or not the same plaintiff would end up in the same jail again in the future. These two reasons are why the injunctive relief has not been available to these plaintiffs in *Cropp*.

84.     In this case, Plaintiff Haulmark maintains that the archived audio and audiovisual recordings and current characteristics of the online broadcasting services continue to be non-compliant with Title II of the ADA. *Hamer*, 924 F.3d 1093, has described this pattern as the repeated violations doctrine. Furthermore, Plaintiff seeks access to future legislative proceedings, conducted by the state legislature, as this continues to be an integral part of his way of life. (See ¶¶ 7-9 in Exhibit #1 in Docket No. 5-1)

85.     The Defendants could have avoided liability in the first place by designing the online broadcasting services so that they are compliant with the ADA from the beginning. If that were the case, Plaintiff Haulmark would have been able to equally participate in the legislative proceedings on January 14, 2019 by utilizing his own internet-enabled electronic devices without needing a sign language interpreter. (See ¶ 28 in Complaint) Instead, Plaintiff Haulmark had to make numerous requests for the next two years for these online broadcasting services to be brought into compliance with the ADA. The Defendants are liable until they correct their mistakes.

86.     The Defendants "may avoid liability whenever it chooses simply by" designing online broadcasting services "right the first time[.]" "In other words, the" Defendants are "not liable forever; [they are] responsible only for correcting [their] own

mistakes." *Frame v. City of Arlington*, 657 F.3d 215, (5th Cir. 2011) (Cited by Tenth Circuit in *Hamer*, 924 F.3d, 1109) (Modified to fit Plaintiff Haulmark's narration) This proposed order attached with the TRO would compel the Defendants to correct one of their own mistakes as Congress designed the ADA to do so.

87.    The Defendants attempt to undermine the element of Plaintiff Haulmark prevailing on the merits. They cite *Heritage Family Church, Inc. v. Kansas Dept. of Corrections,* No. 18-1259-EFM-KGG, 2018 WL 6065248, (D. Kan. Nov. 20, 2018) concerning the defendant burdening the plaintiff's religious benefits, in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act. This plaintiff sought injunctive relief for the exercise of his religious beliefs. The court decided that the proposed injunctive relief would alter the status quo, which is considered to be an unfavorable form of relief.

88.    Plaintiff Haulmark has already discussed above how he intends to prove that the Defendants violated Title II of the ADA by their policies, procedures, and practices. With his TRO, Plaintiff Haulmark is only seeking for the available real-time captioning function to be activated to bring the online broadcasting services into compliance with Title II of the ADA.

89.    The Defendants assert that Plaintiff "Haulmark has not demonstrated irreparable injury[.]" (See Page 72, Last Paragraph in Defendants' Opposition) Furthermore, the Defendants focus only on the time period between January 11-15, 2021 while ignoring the entire period since the online broadcasting services were implemented years ago. (See Page 28, First Continuing Paragraph in Defendants' Opposition) (See ¶ 47

in Complaint) In a further attempt to insult Plaintiff Haulmark, the Defendants falsely accuse him of "delaying for years" to seek the extraordinary remedy of preliminary injunction. (See Page 28, First Continuing Paragraph in Defendants' Opposition) In reality, Defendants have purposefully withheld necessary auxiliary aids and services from Plaintiff Haulmark, and "continue doing so today." (See ¶ 7 in Complaint) A plaintiff has shown patience in *Hamer* before commencing a lawsuit, as has Haulmark in his case.

90.    Mr. Day purposefully ignored the ADA Title II requirements since before February 20, 2019 by postponing implementing the affirmative action requirements as much as possible. (See Page 2 of 2, Exhibit 5 in Docket No. 1-1 (Page 9 of 34)) ("Day suggested an alternative phrase-in program that would give LAS more time to allocate the money and set up the technology. Right now, the bill has a start date of Jan. 1, 2020. Even delaying until 2021 would be helpful, he said." Additionally with the new "resolution from the Legislative Coordinating Council[,]" Defendant Tom Day agreed to ensure that Plaintiff Haulmark would have effective communication accessibility during the 2020 Legislative Session. (See Page 2, First Continuing Paragraph in Defendants' Opposition)

91.    The Defendants then presented the "$2.74 Million Kansas Virtual Statehouse Project," which is specifically designed to allow for the participation of elected legislators, staff, and members of the public remotely. Furthermore, this $2.74 project is attributing lower priority to the requirement that the online broadcasting services comply with the ADA law. In addition to this assortment of evidence, Kansas House Speaker Ron Ryckman revealed to the Kansas Reflector[8] on the first day of the 2021 Legislature about the KLISS,

---

[8] Kansas Reflector, "*Kansas Legislature commences annual session amid roiling COVID-19 pandemic*", https://kansasreflector.com/2021/01/11/kansas-legislature-commences-annual-session-amid-roiling-covid-19-pandemic/

"If there's a silver lining in all this for the Legislature, [ ] it's that we were able to jumpstart many of things we've wanted to do to increase online access to the process." All done while Plaintiff Haulmark and the individuals with hearing disabilities are continued to be denied effective communication and equal participation in the legislative proceedings. Currently, the Defendants continue to withhold the necessary auxiliary aids and services to Plaintiff Haulmark while demanding for specific and smaller requests. The Defendants are the ones who are delaying the implementation of the requirements to bring their online broadcasting services into compliance with the ADA. Not Plaintiff Haulmark.

92.     While citing *Ex parte Young*, the Defendants assert that there is no ongoing violation of a federal law. (See Page 14, First Paragraph in Defendants' Opposition) Furthermore, the Defendants assert that Defendant LAS "[lack] the capacity to sue or be sued as a matter of law." (See Page 15, continuing paragraph from last page in Defendants' Opposition) (Citing *Fugate v. Unified Govt. of Wyandotte County, Kan.*, 161 F. Supp. 2d 1261, 1266 (D. Kan. 2001))

93.     While the entire archived audio recordings and the audiovisual content do not currently provide effective communication for Plaintiff Haulmark, these services, programs, and activities continue to violate Title II of the ADA with the repeating violations doctrine described in *Hamer*, 924 F.3d, 1093. Defendant Tom Day is the designated person as the public officer to be obtaining the requests for ADA accommodations and is responsible to meet the requests from a person with qualified disability. Therefore, the Defendants are "remaining on the hook for injunctive relief—as

[their] affirmative obligation to accommodate requires—a public entity is incentivized to remedy non-compliant services, programs, or activities in a reasonable yet efficient manner to ensure that full participation." *Hamer*, 924 F.3d*,* at 1109 Defendant Tom Day has the authority to recruit and supervise personnel for administrative duties necessary to satisfy Title II of the ADA, so as to provide requested auxiliary aids and services. (See K.S.A. § 46-1212a) Lastly, the Defendants admit that "LAS and its Director Tom Day carry out administrative duties for the Legislature[.]" (See Page 8, First Paragraph in Defendants' Opposition) Defendant Tom Day is subject to the *Ex parte Young* doctrine since one of his administrative duties includes ensuring compliance with Title II of the ADA.

94.     The Defendants cite *Fugate v. Unified Govt. of Wyandotte County, Kan.*, 161 F. Supp. 2d 1261, (D. Kan. 2001) to argue that Defendant LAS is not subject to be sued by Plaintiff Haulmark.

95.     In pursuant to K.S.A. § 46-1212a, Defendant LAS is created by the state as a division within the LCC. While the LCC has delegated authority to Defendant LAS to oversee ADA requests and to grant auxiliary aids and services to comply with the ADA, the Defendant LAS is a public entity or an instrumentality of a state within the meaning of 42 U.S.C. § 12131(1)(B).

96.     *Fugate* discusses violations of the Fourth and Fourteenth Amendments, not the ADA, so the Defendants' argument is moot. Defendant Tom Day and the Defendant LAS are subject to an enjoinment to bring the online broadcast service into compliance with Title II of the ADA, a remedial statute.

97.     The Defendants are demanding security for bringing their non-compliant $2.74 million dollar contract into compliance with the ADA under Rule 65(c) of the Federal Rules of Civil Procedure. (See no. 206 in Defendants' Opposition) ("If granted, Haulmark will be required to post security as per Fed. R. Civ. P. 65(c).")

98.     The Defendants are barred from requiring Plaintiff Haulmark to pay any fees or compensation to abide by the ADA. 28 CFR § 35.130(f) ("A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part.") The applicable rule of the Federal Rules of Civil Procedure does not operate in its usual capacity as a firm bar to this requested temporary restricting order and preliminary injunction. Furthermore, any compliance with the ADA is non-delegable, as Defendant Tom Day cannot absolve himself of any liability for discrimination arising from the services, programs, or activities offered by the Defendants.

99.     The Defendants are attacking the relationship between the ADA and the Kansas statutes. (See Page 26, Last Paragraph in Defendants' Opposition) They falsely state that Plaintiff Haulmark admits a new legal theory. However, Plaintiff Haulmark is simply citing the state laws that play a significant role in how the ADA provides greater protection. 28 C.F.R. § 35.103(b) With the enactment of these state laws, the Kansas Legislature believed that people who are Deaf or Hard of Hearing must play a role in determining what the best means of communication for them are.

100.    While seeking injunctive relief under Title II of the ADA, Plaintiff Haulmark only has to allege that he was denied meaningful access to a public entity's program, services, or activities. The Defendants have not shown that Plaintiff Haulmark has been provided with meaningful access to the entire audio and audiovisual content available through the online broadcasting services.

101.    Due to the fact that Plaintiff Haulmark is *pro se*, the proposed order may not be perfectly crafted. The purpose of the proposed order is to activate the available real-time captioning of the online broadcasting services. And for all persons of the Defendant State of Kansas not to assist the Defendants LAS and Tom Day in circumventing the proposed order, if granted.

### VII. INTENTIONAL DISCRIMINATION OR DELIBERATE INDIFFERENCE

102.    The credible allegations of intentional discrimination (deliberate indifference) are not necessary to support Plaintiff Haulmark's TRO, but the Defendants assert that there are no intentional instances. This needs to be briefly addressed here.

103.    The Defendants assert that Defendant Tom "Day was trying to work with Haulmark[.]" (See Page 26, First Paragraph in Defendants' Opposition) The claim is not true because there are many instances where Plaintiff Haulmark's requests were ignored and denied by Defendant Tom Day.

104.    As required, Plaintiff Haulmark alleged that there had been intentional discrimination. *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153–54 (10th Cir. 1999)

105.   Plaintiff Haulmark is not required to prove personal animosity or ill will when alleging intentional discrimination. *Barber v. Colorado*, Department of Revenue, 562 F.3d 1222, 1228 (10th Cir. 2009); *Powers* at 1153

106.   Instead, "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Powers* at 1153 In other words, "[t]he test for deliberate indifference in the context of intentional discrimination comprises two prongs: (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that . . . likelihood." *Barber* at 1229 (Internal quotation marks omitted)

107.   In order to obtain monetary damages under Title II of the ADA, Plaintiff Haulmark must show that the Defendants acted with intentional discrimination. *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) ("To recover compensatory damages under § 504 [of the Rehabilitation Act], a plaintiff must establish that the [public entity's] discrimination was intentional.") (citation omitted); see also *Hamer v. City of Trinidad*, 924 F.3d 1093, 1108–09 (10th Cir. 2019) (Conclusion: For the ADA to impose compensatory damages, intentional discrimination must have occurred.); *Hans v. Bd. of Shawnee Cty. Comm'rs*, 775 F. App'x 953, 956 (10th Cir. 2019) (Conclusion: Tenth Circuit reviews and agree with other circuit holdings that plaintiff can recover compensatory damages only after establishing intentional discrimination.)

108.   "[F]ailure to act is a result of conduct that is more than negligent, and involves an element of deliberateness." *Barber* at 1229; 28 C.F.R. § 35.160(a)(1) ("A public

entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."), (b)(1) ("A public entity shall furnish appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities ... an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.")

109.    For at least two years, the Defendants have continued to fail to take the appropriate steps to ensure that Plaintiff Haulmark can equally participate in their services, programs, and activities.

## VIII. CONCLUSION

110.    The Defendants' Opposition acknowledges that they had received Plaintiff Haulmark's requests, refuse to follow the ADA Title II provision requiring them not to treat Plaintiff Haulmark in a discriminatory manner, and are making excessive demands for small requests in order to act.

111.    With this TRO and preliminary injunction, Plaintiff Haulmark is seeking a court order to activate the available real-time captioning feature so that he can equally participate in observing the ongoing legislative proceedings of the 2021 Legislative Session through the online broadcasting services while not suffering irreparable harm.

112.    When this litigation comes to a conclusion, the Defendants are to correct all of their errors and ensure that Plaintiff Haulmark is no longer excluded from all of their programs, services, and activities. This includes the production of the transcript for all audio-only recordings, currently available on the Kansas Legislature website, and all video

recordings, currently available on their YouTube Channel. Both serve as sources of content containing the legislative proceedings.

113.    Plaintiff Haulmark has demonstrated that (1) Plaintiff Haulmark is substantially likely to succeed on the merits; (2) Plaintiff Haulmark will suffer irreparable injury if the injunction is denied; (3) the Plaintiff Haulmark's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.

WHEREFORE, Plaintiff Haulmark requests that this Court grant the Motion for Temporary Restraining Order and Preliminary Injunction.

----------------------------------------------------------------

Respectfully submitted this 11th of March

/s/ChrisHaulmark
PLAINTIFF, *pro se*
chris@sigd.net
600 S. Harrison St
Apt #11
Olathe, KS 66061
512-366-3981

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th of March, a true and correct copy of the above and foregoing document was sent via email as an attached file in format of PDF to the clerk of the U.S. District Court for the District of Kansas and a copy with postage prepaid was placed in mail of the U.S. Mail to the following:

M.J. Willoughby
Assistant Attorney General
120 S.W. 10th, 2nd Floor
Topeka, KS 66612

/s/ChrisHaulmark
PLAINTIFF, *pro se*